UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CRAIG S. WILSON, | ) | CASE NO. 5:21-cv-984 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | |
| KELSEE R. OSBORN, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is the motion for summary judgment of defendant Kelsee Osborn ("Osborn" or "defendant"). (Doc. Nos. 38 & 39, as supplemented by Doc. No. 40.) Plaintiff Craig Wilson ("Wilson" or "plaintiff") filed a memorandum in opposition (Doc. No. 41), and Osborn filed a reply (Doc. No. 43). For the reasons set forth herein, Osborn's motion is granted.

**I. Introduction**

Wilson initiated this lawsuit under 42 U.S.C. § 1983 by filing his complaint on May 12, 2021. "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or laws of the United States." *Waters v. City of Morristown*, 242 F.3d 353, 358–59 (6th Cir. 2001).

The complaint has been amended twice. Osborn is the sole remaining defendant and there is no dispute that she was, at all relevant times, "a person acting under color of state law" in her capacity as a former Ohio State Trooper. In Wilson's first and second causes of action (the only remaining claims), he alleges that Osborn detained him in violation of his right to be free from unreasonable seizures and that she arrested him without probable cause.

Osborn argues in her motion for summary judgment that she did not violate Wilson's constitutional rights because she had reasonable suspicion to detain him for the purpose of administering field sobriety tests, which led to probable cause for his arrest for operating a vehicle under the influence ("OVI"), and that she further had probable cause to arrest him for speeding, committing marked lane violations, and for driving while intoxicated. Osborn also argues that she is entitled to qualified immunity.

The recitation of facts herein is based primarily on Wilson's deposition (Doc. No. 38-3) and Osborn's affidavit (Doc. No. 40-1), coupled with citations to the dashcam recording of the traffic stop at issue (Doc. No. 39). When video evidence exists depicting the relevant facts, the facts are viewed "in the light depicted by the videos." *Gordon v. Bierenga*, 20 F.4th 1077, 1079 (6th Cir. 2021) (quoting *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007))). "If the facts shown on video 'can be interpreted in multiple ways or if [the] videos do not show all relevant facts,' [the court] view[s] those facts in the light most favorable to the non-moving party." *Id*. (citing *Latits*, 878 F.3d at 547 (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015))).

Wilson also supplied an affidavit. (Doc. No. 41-1.) In his opposition brief he cites almost exclusively to this affidavit along with the dashcam video, as opposed to his earlier deposition. Under the "sham affidavit" rule, "a party cannot create a genuine dispute of material fact with an affidavit that [directly contradicts or is in tension] with the party's earlier testimony about the fact." *Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 842 (6th Cir. 2021) (citations omitted). Therefore, in this opinion, the Court cites Wilson's affidavit only where it adds to or supports the undisputed facts, without conflicting with his prior deposition testimony.

## II.    Factual Background

Wilson is a patrol officer employed by the Northfield Police Department in the Village of Northfield, Ohio. (Doc. No. 38-3, Wilson Deposition, at 8.[1]) He has worked in law enforcement since December 2011, starting part-time with Northfield, then adding another part-time position with Springfield Township, followed by a fulltime position with Maple Heights, and finally being hired fulltime in 2017 by Northfield in the patrolman position he currently holds. (*Id*. at 8–9;[2] Doc. No. 41-1 ¶ 2.)

On July 4, 2020, at around 10:00 p.m., Wilson was off duty, having completed a scheduled shift from 6:00 a.m. to 6:00 p.m. (Doc. No. 38-3, at 22; Doc. No. 41-1 ¶ 3.) He was driving his vehicle (a gray Toyota Tundra) northbound on I-77/Route 8 in Summit County, Ohio,[3] heading home to Cuyahoga Falls from a restaurant/bar in Portage Lakes. (Doc. No. 39-3, at 13–16.) His vehicle was observed by Osborn, who was at the time a trooper for the Ohio State Highway Patrol and was working routine patrol on 1-77. (Doc. No. 40-1, Affidavit of Kelsee Osborn ¶ 3.) She followed Wilson with her dashcam activated and recording.

At all relevant times and locations, the posted speed limit was 55 mph, but Osborn observed the gray Toyota Tundra "traveling at erratic speeds, abruptly slowing down to speeds of 55 [mph] and reaching speeds of 86 [mph] while in a 55 [mph] zone." (*Id*. ¶¶ 7–8, 10.) Osborn also attests that she observed Wilson's vehicle "swerving heavily within its lane and making multiple marked

---

[1] All page number references herein are to the consecutive page numbers applied to individual documents by the Court's electronic filing system, a practice recently adopted by the Court despite the directives regarding page numbering in the Initial Standing Order (Doc. No. 3).

[2] Wilson was assigned to the Northfield Village detective bureau for a time, but asked to be transferred back to patrol. (Doc. No. 38-3, at 9.)

[3] I-77 north of I-76 changes to Route 8. The record refers to both I-77 and Route 8 as the location where Wilson was driving; Osborn states the events occurred on I-77, while Wilson disputes that. Notwithstanding Wilson's assertion to the contrary (*see* Doc. No. 41, at 9), the exact location is not material to the analysis.

3

lanes violation[s]." (*Id*. ¶ 9.) Wilson does not deny that he was speeding, though he insists that he "never expressly admitted to speeding[.]" (Doc. No. 41-1 ¶ 14.) Nevertheless, he concedes that he "was on [his] way home because [his]-then wife needed to leave for work[,]" and was "accordingly in a hurry to get home." (*Id*. ¶¶ 14, 17.) He also takes issue with Osborn's representation that he was "swerving heavily" as well as her representation that he made multiple marked lane violations. He concludes that "at all relevant times . . . [he] operated [his] motor vehicle in a safe and competent manner." (*Id*. ¶¶ 6, 8.) Notwithstanding these conflicting (and, at times, conclusory) narratives, the dashcam video shows the gray Toyota Tundra, which was originally traveling in the center lane, repeatedly traveling from side to side within that lane. (*See generally* Doc. No. 39.) It also shows the vehicle, or at least its driver-side tires, crossing the line separating the center lane and left lane on one occasion (*id*. at :40–:45), and later crossing over the fog line[4] while Wilson was traveling in the right lane. (*Id*. at 2:40–2:42.)

  Osborn initiated a traffic stop of the Toyota Tundra, but it was "slow to pull over." (Doc. No. 40-1 ¶ 11; Doc No. 39, at 2:54–3:28.) Wilson explained that he "was unable to safely pull over until [he] had passed the exit ramp for Exit IB." (Doc. No. 41-1 ¶ 12.) The dashcam video shows Wilson's vehicle approaching the exit ramp at the time Osborn activated her lights, though the video does not necessarily support Wilson's representation that it was unsafe to pull over sooner. (*See* Doc. No. 39, at 2:54–3:28.)[5] What is clear (and undisputed) is that Wilson delayed pulling over by 23 seconds after Osborn activated her lights. (*Id*.; Doc. No. 41-1 ¶ 12.) Once Wilson had pulled over onto the shoulder lane of the highway, Osborn asked Wilson for his license, inquired

---

[4] The "fog line" is the white line that separates the road from the berm.

[5] Wilson further avers that, after he passed the exit ramp and "pulled into the shoulder lane, [he] continued to travel forward for several seconds before stopping, in order to afford Osborn a sufficient amount of space to safely stop behind me." (Doc. No. 41-1 ¶ 12.)

why he was speeding, and asked how much he had had to drink. (Doc. No. 38-3, at 21, 23–24; Doc. No. 39, at 3:44; 4:12.) Wilson advised Osborn that he was hurrying because his wife, who is a dispatcher, needed to get to work. (Doc. No. 38-3, at 16; Doc. No. 39, at 4:37–4:48.) Wilson gave Osborn his license, along with his police ID, "hoping if she knew I was a fellow officer I would hopefully not get a ticket for a minor traffic violation." (Doc. No. 38-3, at 21–22.)

Osborn noticed that Wilson had "slurred speech and bloodshot eyes." (Doc. No. 40-1 ¶ 14.) The audio from the dashcam recording, however, does not pick up any slurring by Wilson, and it does not clearly show Wilson's eyes.[6] (Doc. No. 40-1 ¶ 14.) And Wilson insists that "at all times" he "clearly and concisely answered Osborn's questions, without ever slurring [his] speech[,]" though he does not deny that his eyes were bloodshot. (Doc. No. 41-1 ¶ 14.). When she initially talked to Wilson from the driver's side door, Osborn "could not detect the odor of alcohol due to an overwhelming odor of vape juice." (Doc. No. 40-1 ¶ 14.) When asked by Osborn how much he had had to drink, Wilson told her he had one beer about an hour before the traffic stop. (*Id*. ¶ 15; Doc. No. 38-3, at 24; Doc. No. 39, at 4:12–4:14; 4:57–5:01.) Osborn then asked Wilson to exit his vehicle and she administered standard field sobriety tests. (Doc. No. 40-1 ¶ 16.)

On these tests, Osborn first "observed 6 of 6 clues on the Horizontal Gaze Nystagmus as well as the presence of Vertical Nystagmus in both eyes." (*Id*. ¶ 17.[7]) While this first test took place outside the view of the dashcam, Wilson does not challenge Osborn's representations regarding her observations as to Wilson's eye movements during this test. Osborn next

---

[6] It should be noted that the dashcam recording failed to pick up every statement Wilson made during his verbal exchange with Osborn, including his responses to Osborn's initial inquires before he exited the vehicle.

[7] "'Nystagmus' describes fast, uncontrollable movements of the eyes, which can be caused by excessive alcohol." *Onwenu v. Bacigal*, 841 F. App'x 800, 804 (6th Cir. 2021) (quoting *Bailey v. City of Howell*, 643 F. App'x 589, 592 n.2 (6th Cir. 2016)).

administered the Walk and Turn Test[8] and observed that Wilson "lost his balance while turning and did not touch heel to toe after losing his balance and stepped on top of his foot on the second step." (*Id*. ¶ 18.) Wilson also failed to "watch his feet during the test, instead looking at the ground in front of him, despite being instructed twice prior to the test and again during the test to make sure he was watching his feet and not the ground in front of him." (*Id*.; Doc. No. 39, at 6:52–8:19.) Finally, Osborn asked Wilson to "perform the One Leg Stand." (Doc. No. 40-1 ¶ 19.[9]) He "swayed during the test[,] . . . [and] did not watch his raised foot during the test, instead looking at the ground ahead of him[,]" despite contrary instructions. (*Id*.; Doc. No. 39, at 8:30–9:41.)

Osborn's training taught her that it is important to carefully follow the instructions during the field sobriety tests and that persons can control the outcome of the tests through practice. (Doc. No. 40-1 ¶¶ 20–21.) She believed that Wilson, who was a police officer with training in these tests, was doing just that. (*Id*. ¶ 22.) Wilson confirmed his familiarity with the tests and that he himself performed them during traffic stops. (Doc. No. 38-3, at 27–28.) Wilson denies that he failed to follow Osborn's instructions or that he had any difficulty performing any of the tests. (Doc. No. 41-1 ¶¶ 18–19.) He also denies he utilized his knowledge and training as a police officer to manipulate the test results. (*Id*. ¶ 20.)

After administering the physical tests, Osborn again asked Wilson how much he had had to drink and, when he said "one beer," she questioned him about the condition of his eyes. He shrugged and explained that he had worked "6:00 to 6:00." (Doc. No. 39, at 9:52–9:53.)

---

[8] The Walk and Turn Test "requires the subject to walk heel to toe along a straight line for nine paces, pivot, and then walk back heel to toe along the line for another nine paces." *Thibault v. Wierszewski*, 695 F. App'x 891, 899 (6th Cir. 2017) (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 585 n.1, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990)).

[9] In the one-leg-stand test, "a person is required 'to stand on one leg with the other leg extended in the air for 30 seconds, while counting aloud from 1 to 30.'" *Thibault*, 695 F. App'x at 900 (quoting *Muniz*, 496 U.S. at 585 n.1).

Osborn next administered a Portable Breath Test ("PBT"),[10] but it "was not functioning properly," and she was "unable to get a reading[]" (Doc. No. 40-1 ¶ 23), even after three (3) attempts (Doc. No. 41-1 ¶ 21). Osborn obtained a different PBT device from another trooper on the scene, but Wilson "refused to make another attempt." (Doc. No. 40-1 ¶ 23; Doc. No. 41-1 ¶ 21; *see also* Doc. No. 38-3, at 37–40; Doc. No. 39, at 10:46–12:58[11].)

Osborn claims she initially "offered" Wilson the PBT (Doc. No. 40-1 ¶ 23); Wilson denies that it was ever "offered," and claims he refused to try for a fourth time with the new PBT device only because he "did not know what [he] did wrong to warrant a PBT." (Doc. No. 41-1 ¶¶ 21–22.) Wilson testified that, as a police officer, he was aware of the consequences of his refusal—that his license would be suspended (and it was). (Doc. No. 38-3, at 45; Doc. No. 40-1 ¶ 27.)

On the dashcam video, after completing the field sobriety tests with Wilson refusing the fourth attempt at the PBT and inquiring why he is being asked to perform the tests, Osborn can be heard telling Wilson[12] that "just because . . . [his] field sobriety wasn't all over the place, [she] still [doesn't] know if [he is] impaired or not because [he] also give[s] them for a living . . . ." (Doc. No. 39, at 12:24–12:33.) Osborn read Wilson his *Miranda* rights (Doc. No. 39, at 13:51–14:04) and placed him under arrest, handcuffing him behind his back and placing him in her patrol car. (Doc. No. 40-1 ¶ 24; Doc. No. 38-3, at 44.) It was at that time that Osborn claims she first detected "a strong odor of alcohol emitting from [Wilson's] person." (Doc. No. 40-1 ¶ 25.) When Wilson questioned the basis for the arrest, Osborn told him that, although he was not "falling over" on the

---

[10] A portable breath test (PBT) measures blood alcohol concentration. *Missouri v. McNeely*, 569 U.S. 141, 145, 133 S. Ct. 1552, 1557, 185 L. Ed. 2d 696 (2013).

[11] The administration of the PBT was outside of the camera range, but there is audio.

[12] At this point, both Osborn and Wilson are out of video range.

physical tests, she saw "signs of other impairment," in particular, all six clues on his eyes and that "the eyes actually are enough to arrest [him]." (Doc. No. 39, at 13:18; 12:23–13:24; 13:47–13:50.) A few minutes later, she told him: "You know as much as I do, the eyes are everything." (Doc. No. 39, at 14:34–14:39.) Based on her interaction and observations, Osborn completed the Impaired Driver Report and the Ohio Department of Health Alcohol and Drug Testing Subject Test Refusal Report. (Doc. No. 40-1 ¶ 29.)

Wilson was ultimately arraigned in Akron Municipal Court, charged with one count of OVI (Ohio Rev. Code § 4511.19(A)(1)(a)) and one count of marked lanes/weaving (Ohio Rev. Code § 4511.33). (Doc. No. 40-1 ¶ 28; Doc. No. 41-1 ¶ 23.) He "received a warning for his speed violations." (Doc. No. 40-1 ¶ 28.) The charges against Wilson were subsequently dropped at the request of the State of Ohio, thus resolving in Wilson's favor. (Doc. No. 41-1 ¶ 23.)

### III. Law and Discussion

#### A. Summary Judgment Standard

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v.*

*Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. And, as already noted, when there is also video evidence, the facts must be viewed "in the light depicted by the videos." *Gordon*, 20 F.4th at 1079. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*.,

351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); s*ee also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

### B. Qualified Immunity

Osborn argues that she is entitled to summary judgment with respect to both of Wilson's claims on the basis of qualified immunity.[13] The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (citation omitted). "Qualified immunity provides police officers 'breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Stanton v. Sims*, 571 U.S. 3, 6, 134 S. Ct. 3, 187 L. Ed. 2d 341 (2013)). Qualified immunity will apply "'if officers of reasonable competence could disagree on the issue.'" *Id*. (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)); *see Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (qualified immunity will apply unless it is obvious that no reasonably competent official would have concluded that the action was lawful).

---

[13] The Supreme Court has underscored the importance of making the qualified immunity determination as early as possible. *Pearson*, 555 U.S. at 232 (noting that qualified immunity is "an immunity from suit rather than a defense to liability, [so] it is effectively lost if a case is erroneously permitted to go to trial" (quotation marks and citation omitted)).

Courts employ a two-part test to determine if qualified immunity applies. First, courts determine whether the facts, taken in a light most favorable to the party alleging injury, show an officer's conduct violated a constitutional right. *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002); *see Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Second, if a constitutional right was violated, courts must determine "whether the violation involved a clearly established constitutional right of which a reasonable person would have known." *Peete v. Metro. Gov't of Nashville & Davidson Cnty.*, 486 F.3d 217, 219 (6th Cir. 2007) (quotation marks and citation omitted). If a plaintiff fails to establish either prong, he has failed to carry his burden, and judgment is appropriate for the defendant. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). Since the failure of either prong is dispositive in favor of a defendant, the Court may address either prong first. *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

### C. Traffic Stop, Field Tests, and Arrest

Wilson's claims do not challenge Osborn's decision to pull over his vehicle. (*See generally* Doc. No. 1.) Rather, he maintains that, once he was stopped, Osborn illegally detained him for the purpose administering field sobriety tests (*id*. ¶¶ 47–49), and then illegally arrested him without probable cause and in violation of the Fourth and Fourteenth Amendments to the United States Constitution. (*Id*. ¶¶ 51–53.) Osborn, in turn, asserts that she legally stopped Wilson for traffic violations, then lawfully extended the search upon developing a reasonable suspicion that Wilson was intoxicated, and finally arrested him after acquiring the requisite probable cause to believe that he had operated a vehicle under the influence of alcohol.

*1. Initial Stop*

Even though Wilson's claims cover only his detention and arrest, it is necessary to briefly touch on the initial stop in order to place the subsequent events in the proper context. It is well settled that an officer has probable cause under the Fourth Amendment to stop a vehicle when the officer observes a driver violate a traffic law. *United States v. Hughes*, 606 F.3d 311, 316–17 (6th Cir. 2010); *see United States v. Sanford*, 476 F.3d 391, 395 (6th Cir. 2007). The officer's internal motivation is irrelevant "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993).

Here, Osborn asserts that she stopped Wilson for speeding and, in particular, for driving at erratic speeds in a 55 mph zone—abruptly speeding up as high as 86 mph, then slowing down to 60 mph, then speeding up again to 82 mph, and finally slowing abruptly to 55 mph. (Doc. No. 40-1 ¶ 10.) Although the dashcam video does not lend itself to determining speed (since it does not include any speed-metering mechanism or display), Wilson essentially admitted the speeding violation. When Osborn first stopped him and asked why he was speeding, Wilson responded that he was in a hurry to get home because his wife, a police dispatcher, had to go to work. (Doc. No. 38, at 8 (citing Doc. No. 39, at 3:46, 4:36; Doc. No. 38-3, at 16:4–8).) Wilson did not deny Osborn's on-scene characterization of "speeding." Wilson also admitted during his deposition that he did not know how fast he was traveling when Osborn stopped him. (Doc. No. 38-3, at 15:18–19.) Although Wilson now asserts in his affidavit that he "never expressly admitted to speeding" (Doc. No. 41-1 ¶ 14), he cannot use that belated assertion to create a material fact dispute, given

12

his response at the scene of the stop coupled with his deposition testimony.¹⁴ *See Green v. Throckmorton*, 681 F.3d 853, 858 (6th Cir. 2012) ("[The officer] clearly had . . . probable cause here [to believe that the motorist has violated a traffic law] because [the motorist] admits that she failed to dim her high beams in the face of oncoming traffic, and the failure to do so is a violation of an Ohio traffic law." (statutory citation omitted) (internal alteration including a citation to *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009))).

Beyond denying that he "expressly admitted" to speeding, Wilson says little in his opposition brief about speeding—mostly arguing that it is implausible that Osborn could have "paced" him. (Doc. No. 41, at 9–12.) Most importantly, Wilson does not effectively refute his deposition testimony, nor does he deny his clear response on the video that he was "in a hurry" when asked by Osborn why he was *speeding*. (Doc. No. 39, at 3:46; 4:36.) The undisputed fact that he was speeding, alone, is sufficient for purposes of summary judgment to support the initial stop.

Nevertheless, the parties devote much attention in the briefing to the question of whether Wilson also committed marked lane violations under Ohio law (Ohio Rev. Code § 4511.33). (Doc. No. 38, at 13–14; Doc. No. 41, at 9–12; Doc. No. 43, at 4–7; *and compare* Doc. No. 40-1 ¶ 9 [noting that she witnessed Wilson's vehicle "making multiple marked lanes violation[s]"] *with* Doc. No. 41-1 ¶ 8 ["At no time . . . did I ever commit a marked line violation . . ."] (Doc. No. 41-1 ¶ 8.) The debate is academic for two reasons. First, as previously mentioned, Wilson does not challenge the initial stop in his complaint, and the stop does not factor into either of his claims

---

¹⁴ Of course, saying that he did not expressly admit to speeding is not the same thing as presenting affirmative evidence that he was not speeding. *See Bell*, 351 F.3d at 247. Confronted with a well-supported motion for summary judgment, the non-moving party may not rely on the pleadings, but must present "significant probative evidence" in support of his claims. *Goines*, 926 F.2d at 561.

13

against Osborn. Second, also as previously noted, the undisputed fact that Wilson was speeding was sufficient, on its own, to justify the stop. Accordingly, any factual dispute regarding whether Wilson's actions constituted marked lane violations under Ohio statutory law is not material, for purposes of summary judgment, as to the question of whether the initial stop was warranted. Here, Osborn stopped Wilson's vehicle, in part, because she observed him erratically changing speeds and intermittently exceeding the speed limit. Therefore, whether or not Wilson may have failed to maintain marked lanes in violation of Ohio law, it is undisputed that he was speeding—which alone justified the traffic stop.

### 2. *Continued Detention and Sobriety Tests*

"[O]nce the purpose of [a] traffic stop is completed, a police officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *Torres-Ramos*, 536 F.3d at 550 (internal quotation marks and citations omitted). "Otherwise, the continued detention constituted an illegal seizure[.]" *Id*. The reasonable suspicion standard is less demanding than the probable cause standard, but it still requires more than a mere hunch. *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002); *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008). The standard "requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *United States v. Ellis*, 497 F.3d 606, 612–13 (6th Cir. 2007) (internal quotation marks and citations omitted). When making a reasonable suspicion analysis, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (citation omitted).

Ohio courts have identified a non-exhaustive list of factors an officer can consider in making the decision to conduct field sobriety tests including the time and day of the stop, the location of the stop, erratic driving (including speeding, weaving, unusual braking), bloodshot eyes, the odor of alcohol, the suspect's demeanor, and any admission of drinking. *Ohio v. Evans*, 711 N.E.2d 761, 766 n.2 (Ohio Ct. App. 1988); *see also Bradley v. Reno*, No. 4:12-cv-890, 2014 WL 4955948, at *5 (N.D. Ohio Sept. 30, 2014) (quoting *Evans*), *aff'd*, 632 F. App'x 807 (6th Cir. 2015); *see also State v. Hill*, 2008 Ohio 3249, 2008 WL 2586696, at *2 (Ohio Ct. App. June 25, 2008) (In determining whether there was reasonable suspicion to administer field sobriety tests, the "court is to examine the totality of the circumstances and determine whether reasonable grounds existed, including the person's actions before, during, and after driving the vehicle.") Several of these factors were present. Wilson was observed around 10:00 p.m. on the Fourth of July speeding on the highway and driving in an erratic manner. Osborn observed (and the dashcam video showed) Wilson's vehicle sway within its lane and drift over the lane lines on two occasions. Additionally, Wilson admitted that he had been drinking and his eyes appeared to be bloodshot. Finally, Osborn was aware that Wilson took approximately 23 seconds to pull over after she activated her lights.[15] These specific, articulable (and undisputed) facts made it reasonable for Osborn to extend the traffic stop in order to conduct field sobriety tests. *See State v. Criswell*, 833 N.E.2d 786, 788 (Ohio Ct. App. 2005) (odor of alcohol, speeding, bloodshot eyes, and admission of drinking a couple of beers was sufficient to justify the administration of field sobriety tests);

---

[15] While Osborn could not detect the smell of alcohol in the vehicle, she noted that the smell of vape juice was overwhelming. Wilson does not deny that he had been vaping prior to his encounter with Osborn, nor does he deny that his vehicle smelled of vape juice. Given these undisputed facts, the reasonable officer would not have concluded that the lack of a detectable smell of alcohol factored against a reasonable suspicion that the motorist had been drinking.

15

*State v. Howard*, No. 2007 CA 42, 2008 Ohio 2241, 2008 WL 1991910, at *2–3 (Ohio Ct. App. May 9, 2008) (speeding in conjunction with other factors, such as bloodshot eyes and the admission of drinking one alcoholic drink, was sufficient justification to conduct a field sobriety test).

### 3. Probable Cause for the Arrest

Finally, Wilson argues that he was arrested without probable cause. "It is clearly established that arrest without probable cause violates the Fourth Amendment." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (quotation marks and citation omitted). Probable cause to arrest exists when "the facts and circumstances within the officer's knowledge" are "sufficient to warrant a prudent person, or one of reasonable caution, in believing" that the suspect "has committed, is committing or is about to commit an offense." *Thacker v. Columbus*, 328 F.3d 244, 255 (6th Cir. 2003) (internal citation omitted). "[A]n arresting [officer] is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting" officer. *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) (citation omitted). Again, the probable cause determination is based on the totality of the circumstances known to officer on the scene. *Id*. The fact that an arrestee is later found innocent has no effect on whether probable cause existed at the time of the arrest. *Criss v. Kent*, 867 F.2d 259, 262 (6th Cir. 1988).

The Court finds that the totality of the undisputed facts known to Osborn, as a matter of law, supported probable cause to arrest Wilson for operating a vehicle while under the influence in violation of Ohio law. In addition to the speeding, erratic driving, blood shot eyes, and admission of alcohol consumption, Osborn "observed 6 of 6 clues" on the standard eye tests in both eyes. Because Wilson volunteered the fact, Osborn also knew that Wilson was a police officer and would

16

have been aware of the ways that an individual could improve performance on other field sobriety tests, such as the walk and turn test and the one leg stand test. Finally, she was aware that Wilson had refused to submit to a second PBT, once she had acquired a functioning machine.[16] *See Bailey v. City of Howell*, 643 F. App'x 589, 596 (6th Cir. 2016) ("A person's refusal to submit to a field sobriety test, when 'combined with evidence of alcohol consumption,' can give rise to probable cause to arrest the person for driving under the influence of alcohol." (quoting *Kinlin v. Kline*, 749 F.3d 573, 580–81 (6th Cir. 2014)).

Nevertheless, Wilson insists that there are factual disputes that preclude a determination of qualified immunity on summary judgment, and indeed there remain facts in dispute: whether Wilson committed one or more "marked lane" violations, as that term is understood under Ohio Rev. Code § 4511.33,[17] whether Wilson could have safely pulled over his vehicle sooner, whether he was slurring his words, whether he lost his balance or swayed while performing the physical sobriety tests, whether he used his police training to improve his performance on those tests, and whether he was initially offered a PBT. But the mere existence of some factual disputes will not frustrate an otherwise proper summary judgment motion. *Dunigan v. Noble*, 390 F.3d 486, 491–2 (6th Cir. 2004) (citing *Anderson*, 477 U.S. at 247–48 (quotation marks omitted)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude

---

[16] She would also have known that, as a police officer, Wilson would have been aware of the consequences of refusing the test. (*See* Doc. No. 38-3, at 45.)

[17] As previously noted, it is clear from the video that at least a portion of Wilson's vehicle traveled over the left lane line on one occasion and later drifted over the fog line onto the right berm. While the parties debate whether this action violated Ohio Rev. Code § 4511.33, the fact remains that it appeared from this action and the weaving within the lane that Wilson was having difficulty controlling his vehicle. The overall operation of his vehicle was a fact Osborn was entitled to consider under the totality of the circumstances in deciding whether to initiate field sobriety tests and ultimately arrest Wilson, regardless of whether such action alone would have justified the initial stop on a traffic violation under Ohio law.

the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248 (citation omitted).

Even if each of the above-mentioned contested facts was resolved in favor of Wilson, it would not have precluded a finding of probable cause as a matter of law. In *Kinlin*, the undisputed facts known to the officer at the time of arrest demonstrated that the plaintiff had made an unsafe lane change, smelled of alcohol, admitted to consuming alcohol, and refused to submit to a field sobriety test. The court found these facts sufficient to support the district court's determination that the officer had probable cause as a matter of law to arrest plaintiff. *Kinlin*, 749 F.3d at 580. While the court in *Kinlin* also noted that facts—such as the fact that plaintiff "was not driving erratically beyond the sudden lane change, was steady on his feet, and did not slur his words"— were "part of the totality of the circumstances" known to the officer at the time of the arrest, it found that these facts were "insufficient . . . to vitiate probable cause." *Id*.; *see Bailey*, 643 F. App'x at 596 (fact that plaintiff passed two balance tests, did not slur his words or stumble, and may have had justification for careless driving did not negate existence of probable cause to arrest plaintiff where he also was observed leaving a bar at two o'clock in the morning and driving carelessly, had watery, blood-shot eyes, admitted to consuming alcohol, refused to take a preliminary breath test, and smelled of intoxicants).

As the Sixth Circuit observed in *Kinlin*, to require that every fact known to the officer support a finding of probable cause would "turn a totality-of-the-circumstances determination into a requirement that an officer have clear and convincing evidence before making an arrest." *Kinlin*, 749 F.3d at 580–81. Rather, "[t]he Fourth Amendment . . . requires only probable cause in light of the totality of the circumstances." *Id*. (quoting *Miller v. Sanilac Cnty.*, 606 F.3d 240, 249 (6th Cir. 2010) ("An officer must consider the totality of the circumstances, recognizing both the

18

inculpatory *and* exculpatory evidence, before determining if he has probable cause to make an arrest. . . ." (alteration in original)).

Here, the undisputed facts outlined above support Osborn's reasonable suspicion to detain Wilson for field sobriety tests, the results of which gave her probable cause to arrest Wilson for OVI.[18] Even if the Court credits all of the disputed facts in Wilson's favor, as it must do on summary judgment, those facts do not change the analysis or the outcome. While it is admittedly a close call, the Court must conclude that, under the totality of the circumstances, "officers of reasonable competence could disagree on the issue[s]." *Mullins*, 805 F.3d at 765. Because Osborn had reasonable suspicion to detain Wilson and probable cause to arrest him, she did not violate any of Wilson's constitutional rights and that conclusion ends the qualified immunity analysis in Osborn's favor. *See Chappell*, 585 F.3d at 907.

## IV. Conclusion

For the reasons set forth herein, Osborn's motion for summary judgment (Doc. No. 38) is granted and this case is dismissed.

**IT IS SO ORDERED**.

Dated: December 9, 2022

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[18] Because the Court finds Osborn had probable cause to arrest Wilson for OVI, it need not consider her alternative arguments that she had probable cause to arrest Wilson for traffic violations.